UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DARRON T. TRASK and TAMMY
TRASK,

                        Plaintiffs,

       v.

CARBON PRODUCTS, INC.,
INTERNATIONAL PROCESS
EQUIPMENT CO., INC.,

                    Defendants.

**DECISION AND ORDER**

1:18-CV-01130 EAW

---

INTERNATIONAL PROCESS
EQUIPMENT CO. INC.,

              Third-Party Plaintiff,

       v.

CARBON GRAPHITE MATERIALS,
INC.,

              Third-Party Defendant.

---

## <u>INTRODUCTION</u>

Plaintiffs Darron T. Trask and Tammy Trask (collectively "Plaintiffs") assert claims for negligence, strict products liability, breach of implied and express warranty, and loss of consortium against defendants Carbon Products Inc. ("Carbon Products") and International Process Equipment Co., Inc. ("IPEC"), arising out of injuries suffered by Mr. Trask while using a pulverizing machine designed, manufactured, and sold by IPEC

- 1 -

to Carbon Products, and subsequently sold by Carbon Products to third-party defendant Carbon Graphite Materials, Inc. ("Carbon Graphite"), Mr. Trask's then-employer.  (*See* Dkt. 2).   IPEC has filed a third-party complaint seeking contribution and/or indemnification from Carbon Graphite (Dkt. 12), and has also asserted a cross-claim for contribution and/or indemnification against Carbon Products (Dkt. 8 at ¶¶ 89-90). Carbon Products has asserted a cross-claim for contribution and/or indemnification against IPEC (Dkt. 14 at ¶ 44), and Carbon Graphite has asserted a counterclaim against IPEC for contribution and/or indemnification and a cross-claim against Carbon Products for contribution and/or indemnification (Dkt. 19 at ¶¶ 27-32).

Currently pending before the Court are: (1) Carbon Graphite's motion for summary judgment (Dkt. 67); (2) Carbon Products' motion for summary judgment (Dkt. 71); and (3) IPEC's motion for summary judgment (Dkt. 74).  For the reasons that follow, the Court grants Carbon Graphite's motion, grants Carbon Products' motion, and grants in part and denies in part IPEC's motion.

## FACTUAL BACKGROUND

The following facts are taken from the parties' statements of undisputed fact submitted in connection with the pending motions for summary judgment (Dkt. 67-5; Dkt. 71-16; Dkt. 74-11), the responses thereto (Dkt. 76-2; Dkt. 78-5; Dkt. 79-15)[1],  and

---

[1]     None of the other parties responded to Carbon Graphite's motion for summary judgment, and in particular they did not file any opposition to Carbon Graphite's statement of undisputed facts.  Accordingly, to the extent the statements set forth therein are supported by citations to the evidence of record, they have been accepted as true for purposes of Carbon Graphite's motion.  *See* Loc. R. Civ. P. 56(a)(2).

the exhibits submitted by the parties.  Unless otherwise noted, the facts set forth below are undisputed.

In 1998, IPEC manufactured a "Rotormill," which is a single-speed pulverizing machine consisting of a chamber containing a rotor, with grinding blades mounted thereon, connected via pulleys and belts to an electric motor.  (Dkt. 71-16 at ¶¶ 1-2;  Dkt. 76-2 at ¶¶ 1-2; Dkt. 78-5 at ¶¶ 1-2).  The Rotormill was designed by an engineer named Andreas Nesemann and reviewed for safety by Mr. Nesemann and IPEC's founder, Ronald Miller.  (Dkt. 71-16 at ¶ 3;  Dkt. 76-2 at ¶ 3; Dkt. 78-5 at ¶ 3).  Mr. Nesemann also created the "operator's manual" for the Rotormill.  (Dkt. 71-16 at ¶ 4;  Dkt. 76-2 at ¶ 4; Dkt. 78-5 at ¶ 4).

As designed by IPEC, material would be fed into the chamber of the Rotormill to be milled by the spinning rotor with attached plates to a small, desired size.  (Dkt. 71-16 at ¶ 5;  Dkt. 76-2 at ¶ 5; Dkt. 78-5 at ¶ 5).  IPEC manufactured each Rotormill to fit an individual customer's needs, and each Rotormill was manufactured to operate at the optimal speed for generating the purchaser's desired end product.  (Dkt. 71-16 at ¶ 7; Dkt. 76-2 at ¶ 7; Dkt. 78-5 at ¶ 7).  In its originally manufactured form, the Rotormill at issue in this action (hereinafter the "subject Rotormill") was equipped with a 30-horsepower, 3,600 RPM motor and a pulley ratio of just under 2:1, resulting in a rotor speed of approximately 6,984 RPM.  (Dkt. 71-16 at ¶ 8;  Dkt. 76-2 at ¶ 8; Dkt. 78-5 at ¶ 8).  The subject Rotormill was initially designed by IPEC to be a test machine for its own lab, and it was used internally at IPEC until 2006.  (Dkt. 74-11 at ¶ 4; Dkt. 79-15 at ¶ 4).

Because the subject Rotormill had been made as single-speed machine, IPEC used a variable frequency drive ("VFD"), which was installed on the machine's power supply, to vary the speed of the electric motor and, in turn, the speed of the rotor.  (Dkt. 71-16 at ¶ 10;  Dkt. 76-2 at ¶ 10; Dkt. 78-5 at ¶ 10).   Increasing the frequency above the standard default of 60 hertz would increase the motor speed, while decreasing the frequency would result in a lower motor speed.  (Dkt. 71-16 at ¶ 12;  Dkt. 76-2 at ¶ 12; Dkt. 78-5 at ¶ 12). As originally manufactured, 60 hertz was the maximum safe frequency, and resulted in a rotor speed of a little less than 7,000 RPM.  (Dkt. 71-16 at ¶ 13;  Dkt. 76-2 at ¶ 13; Dkt. 78-5 at ¶ 13).

Carbon Products purchased the subject Rotormill from IPEC in April of 2006. (Dkt. 74-11 at ¶ 6; Dkt. 79-15 at ¶ 6).  Prior to the sale, IPEC made some modifications to the machine so that it would generate the milled product sought by Carbon Products. (Dkt. 71-16 at ¶ 14;  Dkt. 76-2 at ¶ 14; Dkt. 78-5 at ¶ 14).  These changes included the installation of a 5-horsepower, 1,800 RPM motor with a pulley configuration that resulted in a rotor speed of 1,012 RPM.  (Dkt. 71-16 at ¶ 15;  Dkt. 76-2 at ¶ 15; Dkt. 78-5 at ¶ 15). IPEC further contends that the blades/grinding plates were changed and specifically chosen to best suit Carbon Products' needs, "running at only a thousand RPMs and wanting a specific size of materials."  (Dkt. 76-2 at ¶ 15).  Carbon Products was provided with a user's manual for the subject Rotormill.  (Dkt. 74-11 at ¶ 9; Dkt. 79-15 at ¶ 9).

After taking possession of the subject Rotormill, Carbon Products made some changes, as part of an exploration of the possibility of producing a resin powder needed for one of its products.  (Dkt. 71-16 at ¶ 18;  Dkt. 76-2 at ¶ 18; Dkt. 78-5 at ¶ 18).

Carbon Products swapped the 5-horsepower, 1,800 RPM motor for a 20-horsepower, 3,600 RPM motor.  (Dkt. 71-16 at ¶ 19;  Dkt. 76-2 at ¶ 19; Dkt. 78-5 at ¶ 19).  Carbon Products also installed new pulleys at a 2:1 ratio.  (Dkt. 71-16 at ¶ 20;  Dkt. 76-2 at ¶ 20; Dkt. 78-5 at ¶ 20).  After these changes were made, and due to "several different factors," the actual speed of the subject Rotormill was approximately 3,450 RPM. (Dkt. 71-16 at ¶ 20;  Dkt. 76-2 at ¶ 20; Dkt. 78-5 at ¶ 20).  Carbon Products never installed a VFD on the Rotormill.  (Dkt. 71-16 at ¶ 25;  Dkt. 76-2 at ¶ 25; Dkt. 78-5 at ¶ 25).

Sometime after making these changes, Carbon Products shelved the subject Rotormill for a period of time before selling it to Carbon Graphite in 2010.  (Dkt. 71-16 at ¶ 27;  Dkt. 76-2 at ¶ 27; Dkt. 78-5 at ¶ 27).  Carbon Products asserts, and Plaintiffs do not dispute, that when it sold the subject Rotormill to Carbon Graphite, "the subject Rotormill's assembly, including the access door, rotor chamber, rotor, grinding plates/blades and all bolts and connectors, was exactly the same as when sold by IPEC to Carbon Products in 2006."  (Dkt. 71-6 at ¶ 29; Dkt. 79-5 at ¶ 29).  However, IPEC disputes the veracity of this assertion, contending that the evidence Carbon Products relies upon is equivocal.  (Dkt. 76-2 at ¶ 29).  Carbon Products did not make any warrantees or guarantees regarding the subject Rotormill; it was sold "as is."  (Dkt. 71-16 at ¶ 31;  Dkt. 76-2 at ¶ 31; Dkt. 78-5 at ¶ 31).

Mr. Trask was employed as a plant manager by Carbon Graphite in 2006.  (Dkt. 71-16 at ¶ 33;  Dkt. 76-2 at ¶ 33; Dkt. 78-5 at ¶ 33).  Mr. Trask directed the installation of the subject Rotormill at Carbon Graphite's plant as part of his logistics duties.  (Dkt. 71-16 at ¶ 34;  Dkt. 76-2 at ¶ 34; Dkt. 78-5 at ¶ 34).  As part of the installation process, a

VFD owned by Carbon Graphite was installed on the machine's power supply, allowing the operator to vary the machine's speed. (Dkt. 71-16 at ¶ 36; Dkt. 76-2 at ¶ 36; Dkt. 78-5 at ¶ 36). No training was ever provided to Carbon Graphite's employees regarding safe use of the subject Rotormill. (Dkt. 71-16 at ¶ 38; Dkt. 76-2 at ¶ 38; Dkt. 78-5 at ¶ 38). Further, Mr. Trask does not dispute that he never reviewed the subject Rotormill's manual for information regarding safe operating speeds and did not know what the range of motor speeds were on the subject Rotormill, but contends that the manual did not contain information regarding safe operating speeds. (Dkt. 74-11 at ¶ 22; Dkt. 79-15 at ¶ 22).

In May of 2016, Mr. Nesemann and Mr. Miller corresponded via email with Ryan Walker, the president of Carbon Graphite. (Dkt. 79-7). An email sent by Mr. Miller on May 17, 2016, indicates that he and Mr. Walker had spoken that morning and that Mr. Miller had asked Mr. Walker what "horsepower you have on your mill" and for "a couple digital photos showing the setup that you have using our mill[.]" (*Id*. at 1). Mr. Walker replied that the pulley below the motor was 9 inches in diameter, to which Mr. Miller replied, "I have your email telling me you have a 9" pulley on your motor which I think is a 20hp at 3600 rpm." (*Id*. at 1-2). In addition, Mr. Miller stated that in order to make a new Rotormill for Carbon Graphite, he would "need to know at what speed you are running your mill at now. It is not possible to figure it out with the size of only one pulley. So we would like to have the pictures that we talked about and the size of the pulley on the rotor." (*Id*. at 2). After additional communications regarding the pulley

sizes and the amperage the machine was drawing, Mr. Walker sent photographs of the subject Rotormill to Mr. Miller.  (*Id*. at 3-9).

On August 25, 2016, Mr. Trask was using the subject Rotormill with the installed VFD.  (Dkt. 71-16 at ¶ 39;  Dkt. 76-2 at ¶ 39; Dkt. 78-5 at ¶ 39).  There is a dispute regarding the speed at which Mr. Trask was operating the subject Rotormill.  (Dkt. 71-16 at ¶ 40;  Dkt. 76-2 at ¶ 40; Dkt. 78-5 at ¶ 40).  Mr. Trask was attempting to take larger flake graphite and run it through the subject Rotormill to reduce the size, because Carbon Graphite was about 200 pounds short for an order that needed to be fulfilled.  (Dkt. 71-16 at ¶ 41;  Dkt. 76-2 at ¶ 41; Dkt. 78-5 at ¶ 41).  The subject Rotormill catastrophically failed, causing the rotary chamber's door to break free from the machine and strike Mr. Trask.  (Dkt. 71-16 at ¶ 43;  Dkt. 76-2 at ¶ 43; Dkt. 78-5 at ¶ 43).  The pulleys were not damaged in any way.  (Dkt. 71-16 at ¶ 44;  Dkt. 76-2 at ¶ 44; Dkt. 78-5 at ¶ 44).

As a result of the incident, Mr. Trask suffered a broken right leg, lacerations, and pain in his chest and lower body.  (Dkt. 67-5 at ¶ 6).  Mr. Trask was eventually able to return to work full-time and as of April of 2022 was not receiving any continuing care regarding these injuries.  (*Id*. at ¶¶ 9-16).  The long-term effects of these injuries include right-leg pain and weakness, pain in the left ankle, and pooling of blood in the ankles. (*Id*. at ¶ 9).  A workers' compensation claim was brought as a result of the incident and all of Mr. Trask's related medical expenses were paid by Carbon Graphite's workers' compensation carrier.  (*Id*. at ¶¶ 17-18).

## PROCEDURAL BACKGROUND

Plaintiff filed the instant action on October 15, 2018. (Dkt. 1).  The operative pleading is the amended complaint filed on October 16, 2018.  (Dkt. 2).  IPEC filed its answer and cross-claim on February 5, 2019.  (Dkt. 8).  IPEC filed its third-party complaint against Carbon Graphite on February 19, 2019.  (Dkt. 12).  Carbon Products filed its answer and cross-claim on February 22, 2019.  (Dkt. 14).  Carbon Graphite filed its third-party answer, counterclaim, and cross-claim on April 12, 2019.  (Dkt. 19).

Discovery closed on October 31, 2022.  (Dkt. 59).  Carbon Graphite filed its motion for summary judgment on December 29, 2022.  (Dkt. 67).  No party has filed an opposition to Carbon Graphite's motion.

Carbon Products filed its motion for summary judgment on January 31, 2023. (Dkt. 71).  IPEC filed its opposition on February 28, 2023 (Dkt. 76), and Plaintiffs filed their opposition on March 7, 2023 (Dkt. 78).

IPEC filed its motion for summary judgment on February 7, 2023.  (Dkt. 74). Plaintiffs filed their opposition on March 7, 2023 (Dkt. 79), and IPEC filed a reply on April 4, 2023 (Dkt. 82).  The Court held oral argument on all three pending motions for summary judgment on May 12, 2023, and reserved decision.  (Dkt. 85).

## DISCUSSION

### I.   Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts[] and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown*, 654 F.3d at 358.  Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.   <u>Carbon Graphite's Motion for Summary Judgment</u>

Carbon Graphite seeks summary judgment with respect to IPEC's claim for indemnification or contribution, arguing that Plaintiff did not suffer a "grave injury" as defined in § 11 of New York's Workers' Compensation Law[2] and that there was no written agreement between Carbon Graphite and IPEC for contribution or indemnification. (Dkt. 67-6). No party filed papers in opposition to Carbon Graphite's motion for summary judgment, and the Court confirmed at oral argument that no party opposed the motion. However, "[e]ven when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004).

New York's Workers' Compensation Law "protects employers by barring third-party actions against them 'except in *extremely* limited, defined circumstances.'" *Rayburn v. CSX Transportation, Inc.*, No. 8:17-CV-48 (LEK/CFH), 2017 WL 4990631, at *3 (N.D.N.Y. Oct. 31, 2017) (emphasis in original and quoting *Fleming v. Graham*, 10 N.Y.3d 296, 299-300 (2006)). Specifically, "absent an express indemnification agreement, or a 'grave injury' as enumerated in Workers' Compensation Law § 11, an employer's liability for an employee's on-the-job injury is ordinarily limited to workers' compensation benefits." *Id.* (alteration and citation omitted). Accordingly, to pursue indemnification or contribution from Carbon Graphite (Mr. Trask's employer), IPEC

---

[2]   New York law applies in this diversity action. *See Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013).

must show that either (1) Mr. Trask suffered a grave injury as defined in § 11 of New York's Workers' Compensation Law or (2) there was an express indemnification agreement between IPEC and Carbon Graphite.

Carbon Graphite has adequately demonstrated that IPEC cannot satisfy either of these conditions and is accordingly entitled to summary judgment. As to the matter of grave injury, § 11 defines "grave injury" as:

> [D]eath, permanent and total loss of use or amputation of an arm, leg, hand or foot, loss of multiple fingers, loss of multiple toes, paraplegia or quadriplegia, total and permanent blindness, total and permanent deafness, loss of nose, loss of ear, permanent and severe facial disfigurement, loss of an index finger or an acquired injury to the brain caused by an external physical force resulting in permanent total disability.

N.Y. Work. Comp. L. § 11. Plaintiff conceded during discovery that he has not suffered any of these enumerated injuries, and "New York courts have held that when an injured plaintiff has not alleged that he suffered an injury which may be characterized as grave within the meaning of the Workers['] Compensation Law, it is established, *prima facie*, that plaintiff did not suffer a grave injury." *Rayburn*, 2017 WL 4990631, at *3 (quotation and original alterations omitted); *see also Fleming*, 10 N.Y.3d at 300 ("The categories of grave injuries listed in section 11, providing the sole bases for a third-party action, are deliberately both *narrowly and completely described*; the list, both exhaustive and not illustrative, is not intended to be extended absent further legislative action." (quotations omitted and emphasis in original). Further, IPEC has not come forward with any evidence supporting a finding of grave injury. *See Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) ("where the nonmoving party will bear the

burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the nonmoving party's case" (quotation and alteration omitted)).

There is also no evidence of an express indemnification agreement between Carbon Graphite and IPEC.  To the contrary, Carbon Graphite's president has submitted a sworn affidavit in which he states that no such agreement existed.  (Dkt. 67-3 at ¶ 5).  Again, IPEC has come forward with no contradictory evidence.

On this record, IPEC's claim for indemnification and/or contribution by Carbon Graphite fails as a matter of law.  The Court accordingly grants Carbon Graphite's motion for summary judgment.  Further, and as discussed at oral argument, the Court dismisses Carbon Graphite's counter- and cross-claims as moot in light of this holding.

## III.    IPEC's Motion for Summary Judgement

The Court turns next to IPEC's motion for summary judgment.  IPEC contends that all claims against it (including any counter- or cross-claims) should be dismissed because there is no evidence that Mr. Trask's accident was caused by a defect in the design or manufacture of the subject Rotormill.  (Dkt. 74-12).  Only Plaintiffs have responded to this motion.  The Court considers IPEC's arguments as to each claim below.

### A.    Strict Products Liability

"In New York, there are three distinct claims for strict products liability: (1) a manufacturing defect, which results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm; (2) a warning defect, which occurs when the inadequacy or failure to warn of a reasonably foreseeable risk

accompanying a product causes harm; and (3) a design defect, which results when the product as designed is unreasonably dangerous for its intended use." *McCarthy v. Olin Corp.*, 119 F.3d 148, 154-55 (2d Cir. 1997) (citations omitted).

To prove a manufacturing defect under New York law, "the plaintiff must show that a specific product unit was defective as a result of some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction, and that the defect was the cause of plaintiff's injury.  In other words, a manufacturing flaw exists when the unit in question deviates in quality and other performance standards from all of the other identical units." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 85 (S.D.N.Y. 2001) (quotation and citation omitted). IPEC argues that it is entitled to summary judgment on any manufacturing defect claim, because there is no evidence that the subject Rotormill was defective at the time it left IPEC's hands.  (Dkt. 74-12 at 15-16); *see Crawford*, 758 F.3d at 486.

Plaintiffs' argument regarding their manufacturing defect claim is quite cursory. They state that they "established through their expert's opinion that the [subject Rotormill] was defectively designed and manufactured because of the inadequacy of the bolts used in conjunction with the rotor, the protrusion of other bolts into the chamber and the lack of torque specificity."  (Dkt. 79-14 at 3).  This conflation of Plaintiffs' manufacturing defect claim with their design defect claim does not point to any particular evidence from which a jury could conclude that the subject Rotormill was defectively manufactured.

Further, the Court has reviewed the initial and supplemental reports of Plaintiffs' expert witness, professional engineer Steven R. Brncic.  (Dkt. 78-7; Dkt. 78-8).  In these reports, Mr. Brncic opines that (1) Mr. Trask "did not know the maximum allowable speed of the [subject Rotormill] and thereby unknowingly operated the mill beyond this speed" and (2) "that portions of [the subject Rotormill] were poorly designed and contributed to the failure."  (Dkt. 78-7 at 4; *see also* Dkt. 78-8 at 10 ("It is my opinion that the bolted joint design of the failed [subject Rotormill] was inadequate.")).  Mr. Brncic's expert reports do not provide any support for the conclusion that the subject Rotormill was defectively manufactured, but instead indicate that it was the machine's design that was flawed.  Indeed, when asked at oral argument, Plaintiffs' counsel was unable to point to anything in Mr. Brncic's expert reports supporting a manufacturing defect claim (as opposed to a design defect claim).

Plaintiffs have pointed to no other evidence from which a jury could conclude that there was a manufacturing defect in the subject Rotormill.  "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial."  *Crawford*, 758 F.3d at 486 (citation omitted).  IPEC is entitled to summary judgment on Plaintiffs' manufacturing defect claim.

The Court turns next to Plaintiffs' defective design claim.  "It is well-settled under New York law that a manufacturer is under a duty to use reasonable care in designing its product so that it will be safe when used in the manner for which the product was intended, as well as unintended yet reasonably foreseeable use."  *Liriano v. Hobart Corp.*, 132 F.3d 124, 126 (2d Cir. 1998) (quotation omitted).  Importantly for this case,

"[s]ubstantial modifications of a product from its original condition by a third party which render a safe product defective are not the responsibility of the manufacturer." *Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471, 479 (1980).  This rule precludes recovery on a design defect theory even where the modifications at issue were foreseeable.  *See Liriano v. Hobart Corp*., 92 N.Y.2d 232, 239 (1998) (explaining that requiring a manufacturer to "factor into the design equation all foreseeable post-sale modifications . . . would effectively result in the imposition of absolute liability on manufacturers for all product-related injuries," and that New York law "has drawn a policy line against that eventuality").

IPEC contends that it is entitled to summary judgment on any design defect claim because the subject Rotormill was designed and manufactured to "slowly and gently process materials for" Carbon Products and "when sold was made up of components that could safely handle a rotor speed of 7,200 RPM," but was only capable of obtaining a rotor speed of 1,012 RPM.  (Dkt. 74-12 at 16).  IPEC argues that the subject Rotormill would not have failed without the subsequent modifications made by Carbon Products and Carbon Graphite and that IPEC accordingly cannot be found liable for a design defect under New York law.  In opposition, Plaintiffs argue that the modifications made by Carbon Products and Carbon Graphics were not substantial and did not proximately cause Mr. Trask's injuries.  (Dkt. 79-14 at 5).  Plaintiffs' argument is based on its contention that "the 20 hp motor installed by Carbon Products was still less horsepower than the 30 hp motor on the [subject Rotormill] when manufactured."  (Dkt. 79-14).

Plaintiffs' argument fails because Plaintiffs have misapprehended the relevant time at which the safety of the design must be assessed.  The New York Court of Appeals has unequivocally held that "[w]hile the manufacturer is under a nondelegable duty to design and produce a product that is not defective, that responsibility is gauged <u>as of the time the product leaves the manufacturer's hands</u>."  *Robinson*, 49 N.Y.2d at 479 (emphasis added); *see also Liriano v. Hobart Corp*., 92 N.Y.2d 232, 238 (1998) (a manufacturer's duty to "design a product that is not harmful when used" in a reasonably foreseeable manner "is measured as of the time the product leaves the manufacturer's premises").  In this case, at the time the subject Rotormill left IPEC's premises it was not equipped with a VFD and was capable of obtaining a rotor speed of only 1,012 RPM.  These facts are not in dispute.

In addition, IPEC's expert witness, professional engineer Jack Krafchick, has opined that it was the subsequent addition of a VFD by Carbon Graphite—which allowed the subject Rotormill to operate at rotor speeds in excess of 12,000 RPM—that caused the catastrophic failure of the subject Rotormill.  (Dkt. 74-10).  While Plaintiffs' expert witness, Mr. Brncic, has opined that the accident was caused by the blades of the Rotormill slipping "due to lack of preload on the joint" (Dkt. 78-8 at 6), entirely absent from his expert report is the conclusion that such slippage could or would have occurred at a rotor speed of 1,012 RPM.  Instead, Mr. Brncic's calculations assume a rotor speed of 7,200 RPM.  (*See id*. at 8-9).  Plaintiffs' counsel acknowledged at oral argument that Mr. Brncic has not opined that the accident would have occurred at a speed of 1,012 RPM.  On this record, there is no genuine factual dispute that the subject Rotormill was

materially modified after it left IPEC's premises, and that absent those modifications, the machine would have performed in a safe manner.  Accordingly, Plaintiffs cannot prevail on a design defect theory, and IPEC is entitled to summary judgment with respect to this claim.

However, the Court finds that genuine issues of material fact preclude summary judgment on Plaintiffs' failure-to-warn claim.  "Failure-to-warn liability is intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause."  *Whalen v. CSX Transportation, Inc.*, No. 13 CIV. 3784 (LGS), 2017 WL 4075200, at *3 (S.D.N.Y. Sept. 13, 2017).  To succeed on their failure-to-warn claim, Plaintiffs must show that IPEC failed to warn against a danger resulting from a foreseeable use about which it knew or should have known, and that the failure to warn was the proximate cause of Plaintiffs' harm.  *State Farm Fire & Cas. Co. v. Nutone, Inc.*, 426 F. App'x 8, 10 (2d Cir. 2011).  "Generally, the adequacy of the warning in a products liability case based on failure to warn is, in all but the most unusual circumstances, a question of fact to be determined at trial."  *Whalen*, 2017 WL 4075200, at *5.

Importantly, "recovery is not always precluded where a plaintiff attempts to hold liable the manufacturer of a product that was substantially modified under a failure to warn theory."  *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 186 (E.D.N.Y. 2001). In particular, "a manufacturer may be held liable . . . for failure to warn about dangers to users from foreseeable abuse, including improvident modifications, of a product."

*Dingeldey v. VMI-EPE-Holland B.V.*, No. 15-CV-00916A(F), 2022 WL 3227625, at *6 (W.D.N.Y. Apr. 13, 2022); *see also Pullano v. Chrysler Corp.*, No. 05-CV-0135A(F), 2009 WL 10692145, at *13 (W.D.N.Y. Apr. 23, 2009) ("New York law provides that even if a defective design claim is barred by a plaintiff's substantial modification, a plaintiff may nevertheless maintain a claim for strict products liability based on a failure to warn of the consequences of such modification that rendered the product defective or otherwise unsafe."), *adopted*, No. 05-CV-0135A(F), 2011 WL 13244291 (W.D.N.Y. July 19, 2011).

In this case, a reasonable jury could conclude that it was foreseeable to IPEC that the subject Rotormill could be modified to obtain dangerous rotor speeds. In particular, the fact that IPEC itself had previously equipped the subject Rotormill with both a 30-horsepower motor and a VFD could lead a reasonable jury to conclude that IPEC should have foreseen the need for a warning regarding maximum rotor speed. Moreover, the record is clear that IPEC became aware in May of 2016 that the subject Rotormill had undergone modification, including installation of a 20-horsepower motor, and that IPEC was sent photographs of the subject Rotormill. (*See* Dkt. 79-7); *see also Liriano*, 92 N.Y.2d at 240-41 ("[A] manufacturer may have a duty to warn of dangers associated with the use of its product even after it has been sold. Such a duty will generally arise where a defect or danger is revealed by user operation and brought to the attention of the manufacturer; the existence and scope of such a duty are generally fact-specific. . . . Compared to purchasers and users of a product, a manufacturer is best placed to learn about post-sale defects or dangers discovered in use. A manufacturer's superior position

to garner information and its corresponding duty to warn is no less with respect to the ability to learn of modifications made to or misuse of a product.").

While IPEC contends that its conversations with Carbon Products prior to the sale contained no indication that Carbon Products intended to use the subject Rotormill at anything other than low speeds (*see* Dkt. 74-12 at 18), "[w]hether a particular way of misusing a product is reasonably foreseeable, and whether the warnings which accompany a product are adequate to deter such potential misuse, are ordinarily questions for the jury." *Johnson v. Johnson Chem. Co.*, 183 A.D.2d 64, 69 (2d Dep't 1992). This is not the unusual case where the Court can determine as a matter of law that IPEC was not required to warn about the maximum safe rotor speed.

IPEC also argues that Plaintiffs cannot prevail on their failure-to-warn claim because Mr. Trask made no effort to determine the speed at which the machine was operating despite having testified that it was his responsibility to make sure the subject Rotormill was operating at a safe speed, and accordingly no warning could have prevented his injuries. (Dkt. 74-12 at 20-21). IPEC's argument fails, because it assumes a logical leap that this Court cannot make on a motion for summary judgment. Specifically, IPEC's argument assumes that Mr. Trask still would not have made an effort to determine the speed at which the subject Rotormill was operating even if he had been put on notice of the maximum safe operating speed by IPEC. It would not be appropriate for this Court, on a motion for summary judgment, to speculate without evidence about how Mr. Trask would or would not have modified his behavior in response to a warning.

- 19 -

IPEC also cites case law indicating that a manufacturer need not warn of a hazard which is obvious or of which the injured party was fully aware. (*See* Dkt. 74-12 at 20-21). At oral argument, IPEC expanded on this argument, explaining that it was based on Mr. Trask's deposition testimony in which he stated as follows:

> Q. And what information did you see in reviewing the emails that Ryan Walker did not relay to you?
> A. The one—the glaring one is the speed of the motor.
> Q. Okay. And what did—and what did you notice with regard to the information about the speed of the motor that was not relayed to you?
> A. That the standard RPMs was 3600, and typically every other motor I've ever worked on is 1800.
> Q. Okay. And so what did -- what did that information mean to you?
> A. It means that my calculations were off by half. If—if it was—it was running two to one, so if the motor is 1800, the rotor would be 36, but because it was a 3600 motor, when it was running at 60 hertz, now it's a 7200. And if I'd have known that, things would have been a little different. . . . That's a—that's a pretty dangerous speed, I think, to be ramping it up to, and I—I had no idea that's what it was at.

(Dkt. 74 at 204-205). Based on this deposition testimony, IPEC contends that Mr. Trask was fully aware that operating the Rotormill at speeds in excess of 7,200 RPM was dangerous, and accordingly any failure to warn cannot have proximately caused his injuries.

The Court is unpersuaded by this argument. While Mr. Trask did state that he thought that 7,200 RPM was "a pretty dangerous speed" at which to grind material, he made clear in other parts of his testimony that he had no knowledge of the range of speeds at which the Rotormill was capable of operating and that he played no role in determining what the safe operating speeds for the Rotormill were. (*Id.* at 94, 104). He further testified that he did not have a belief or understanding as to "a maximum RPM for

the rotor that [he] did not want to go above[.]"  (*Id.* at 243).  In other words, Mr. Trask's testimony does not unequivocally demonstrate that he was aware that 7,200 RPM was the maximum safe speed at which the Rotormill could be operated, nor that the maximum safe operating speed was obvious.

Under these circumstances, summary judgment is not warranted.  *See, e.g., Jiminez v. Dreis & Krump Mfg. Co.*, 736 F.2d 51, 55-56 (2d Cir. 1984) (finding summary judgment improperly granted where the injured party "admitted knowledge of the general danger of placing his hand in a machine," but "did not admit knowledge of the danger caused by unintentional" activation of the machine, because "[t]he extent of [the injured party's] knowledge presented a question of fact which made summary judgment inappropriate on the issue of duty to warn"); *Vasquez v. Ridge Tool Pattern Co.*, 205 A.D.3d 657, 660 (1st Dep't 2022) ("[T]he record contains evidence that plaintiff had knowledge of power tools other than the router and the general hazards associated with cutting devices.  Plaintiff also had used the router on one prior occasion at the premises before the accident.  However, it is for a jury, not the court, to determine whether, based on the evidence and testimony presented, plaintiff had sufficient knowledge of the specific hazards from the use of the router to relieve defendants of their duty to warn of them."); *Price v. One World Techs., Inc.*, No. 1:18-CV-00407 BKSCFH, 2020 WL 5821478, at *11 (N.D.N.Y. Sept. 30, 2020) ("Defendant's reliance on Mr. Price's general experience with power tools, and in particular his testimony that he kept his hands several inches away from the Saw's rotating blade when not using the clamp—which, Defendant argues, suggests that Plaintiff was subjectively aware that the clamp was intended as a

safety feature to keep one's hands away from the Saw's blade—does not establish that Defendant is entitled to summary judgment based on a 'knowledgeable user' defense. . . . A 'knowledgeable user' defense requires that a plaintiff was actually aware of the specific hazard that caused his injury, as well as the severity of the potential harm." (quotation omitted)).

For all these reasons, the Court finds, on the record before it, that there are genuine issues of material fact regarding Plaintiffs' failure-to-warn claim against IPEC.

### B.    <u>Negligence</u>

IPEC seeks summary judgment on Plaintiffs' negligence claim on the basis that "there is no indication that the machine was defective when it was designed or manufactured" and "IPEC did not assume any duty to warn [Carbon Graphite] or [Mr. Trask] prior to the accident."  (Dkt. 74-12 at 22).   In opposition, Plaintiffs state that "[t]he same arguments set forth above with respect to the Plaintiffs' strict products liability causes of action apply to their negligence causes of action."  (Dkt. 79-14 at 7).

To the extent Plaintiffs seek to base a negligence claim on an alleged manufacturing defect, their claim necessarily fails for the reasons discussed above— namely, that there is no evidence in the record of any such manufacturing defect. Similarly, the rule regarding subsequent modifications that precludes Plaintiffs' design defect claim applies equally to a negligence cause of action.  *See Robinson*, 49 N.Y.2d at 475 ("[A] manufacturer of a product may not be cast in damages, either on a strict products liability <u>or negligence</u> cause of action, where, after the product leaves the possession and control of the manufacturer, there is a subsequent modification which

- 22 -

substantially alters the product and is the proximate cause of plaintiff's injuries." (emphasis added)).

However, the Court finds that there are genuine issues of material fact regarding Plaintiffs' claim of a negligent failure to warn.  Under New York law, "failure-to-warn claims grounded in strict liability and negligence are functionally equivalent, as both forms of a failure-to-warn claim depend on the principles of reasonableness and public policy at the heart of any traditional negligence action." *In re N.Y.C. Asbestos Litig.*, 27 N.Y.3d 765, 787 (2016).  Accordingly, the same factual disputes that precluded summary judgment on Plaintiffs' strict products liability failure-to-warn claim preclude summary judgment on a negligence-based failure-to-warn claim.

### C.    Breach of Warranty

IPEC seeks summary judgment on Plaintiffs' breach of warranty claims for a number of reasons, including that they are barred by the applicable statute of limitations. (Dkt. 74-12 at 23-24).  "Plaintiffs do not dispute that their breach of warranty causes of action are time-barred."  (Dkt. 79 at ¶ 6).  Accordingly, the Court grants IPEC summary judgment as to Plaintiffs' breach of warranty claims.

### D.    Loss of Consortium and Cross-Claim by Carbon Products

IPEC has not made any specific argument regarding Mrs. Trask's loss of consortium claim.  Accordingly, IPEC has not established that it is entitled to summary judgment on this claim, to the extent the underlying claims survive. *See Bertini v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 246, 260 (E.D.N.Y. 2014) ("A claim for loss of consortium or services is a derivative action, and in the common law of New York, does

not exist independent of the injured spouse's right to maintain an action for injuries sustained." (quotation omitted)).

IPEC further has not made any specific argument regarding Carbon Products' cross-claim against it.  However, for the reasons set forth in detail in section IV, *infra*, the Court finds that Plaintiffs have no valid claims against Carbon Products.  Because Carbon Products' cross-claim against IPEC is entirely derivative of Plaintiffs' claims against Carbon Products, it must fall with those claims.

## IV. <u>Carbon Products' Motion for Summary Judgment</u>

The Court turns finally to Carbon Products' motion for summary judgment. Carbon Products argues that it is entitled to summary judgment on Plaintiffs' strict product liability claims because it was an occasional or casual seller, that it is entitled to summary judgment on Plaintiffs' negligence claim because the record is devoid of any evidence that it breached a duty to Plaintiffs, and that it is entitled to summary judgment on Plaintiffs' breach of warranty claims because they are time-barred and because no warranty was breached.  (Dkt. 71-17).  Both Plaintiffs and IPEC have opposed Carbon Products' motion for summary judgment.  (Dkt. 76; Dkt. 78).

### A. <u>Strict Products Liability</u>

"Under New York law, not every seller is subject to strict liability."  *Jaramillo v. Weyerhaeuser Co.*, 570 F.3d 487, 489 (2d Cir. 2009).  Specifically, "[f]or strict liability purposes, New York courts have drawn a distinction between 'regular' sellers, who sell a given product in the ordinary course of their business, and 'casual' or 'occasional' sellers, whose sale of a product is wholly incidental to the seller's regular business."  *Id.*

(citations omitted).  "[C]asual or occasional sellers are not subject to claims of strict liability." *Id*.  The same is true of a "casual manufacturer." *Gebo v. Black Clawson Co*., 92 N.Y.2d 387, 393-94 (1998).

Carbon Products has submitted evidence that it was a casual seller with respect to the subject Rotormill.  In particular, Peter Ouellet, the president and sole owner of Carbon Products, has submitted a sworn affidavit stating that Carbon Products—which ceased operations in November of 2021—was a manufacturer of graphite brushes for use in electric motors, that it would from time to time sell used or surplus equipment that it no longer needed for its own manufacturing purposes, that these sales were not part of Carbon Products' normal business and were done solely as a means of disposing of unneeded equipment, and that the used equipment sold in this manner was always sold on an "as is" basis, without any warrantees or guarantees.  (Dkt. 71-12 at ¶¶ 4-7).  Mr. Ouellet has further averred that Carbon Graphite was a supplier of raw graphite material to Carbon Products and that Carbon Products sold the subject Rotormill to Carbon Graphite in 2010 because it was no longer needed by Carbon Products.  (*Id*. at ¶¶ 27-28). Mr. Ouellet states that the subject Rotormill was sold to Carbon Graphite as used, surplus equipment, and was sold "as is."  (*Id*. at ¶ 33).

The facts here are similar to the facts in *Sukljian v. Charles Ross & Son Co.*, 69 N.Y.2d 89 (1986), the seminal New York Court of Appeals case regarding casual sellers. There, General Electric had purchased a mill for its own use from the manufacturer.  *Id*. at 91.  Eleven years later, it "determined that the machine was no longer needed in its own production and included it as part of a sale of its surplus property[.]"  *Id*.  General

Electric held two or three sales of its surplus equipment each year, and there was no evidence that it derived any profit from such sales. *Id.* The New York Court of Appeals held that "there is no basis in public policy for the imposition of strict liability" where a corporation disposes of its surplus equipment in an occasional sale. *Id.* at 97. That is the situation presented here.

Plaintiffs argue that Carbon Products "has provided only ambiguous and vague information as to its sales of its used equipment" and that "the sale of the [subject Rotormill] and other used equipment may well be a substantial part of Carbon Products' revenue, however, Carbon Products has not provided detailed sales information in order to make this analysis." (Dkt. 78-4 at 3-4). Plaintiffs misapprehend the standard on a motion for summary judgment. Discovery in this case is closed. Carbon Products has come forward with evidence sufficient to establish that it was a casual seller of the subject Rotormill. Plaintiffs cannot defeat summary judgment by resort to speculation and surmise regarding Carbon Products' revenues. "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *Diesel S.p.A. v. Diesel Power Gear, LLC*, No. 1:19-CV-9308-MKV, 2022 WL 956223, at *3 (S.D.N.Y. Mar. 30, 2022) (citation omitted). In the absence of any actual evidence contradicting Mr. Ouellet's sworn statements, Plaintiffs have failed to establish a genuine issue of material fact regarding Carbon Products' status as a casual seller.[3] The Court finds that Carbon Products is entitled to summary judgment on Plaintiffs' strict liability claims.

---

[3]     Plaintiffs have not argued that Carbon Products' modification of the Rotormill renders it a "manufacturer" as opposed to a seller. However, as noted, the same standards

## B. <u>Negligence</u>

With respect to Plaintiffs' negligence claims, "[u]nder New York law, a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Centi v. Fedigan*, 413 F. Supp. 3d 171, 176 (S.D.N.Y. 2019) (citation and original alteration omitted). "At most, the duty of a casual or occasional seller would be to warn <u>the person to whom the product is supplied</u> of known defects that are not obvious or readily discernible." *Sukljian*, 69 N.Y.2d at 90. Again, the same standard applies to a casual manufacturer. *McCarthy v. Checchin*, 24 A.D.3d 1080, 1082 (3d Dep't 2005) ("[T]he duty of a casual or occasional seller or manufacturer would be to warn the person to whom the product is supplied of known defects that are not obvious or readily discernible." (original alteration omitted)). "A casual and occasional seller does not owe a duty to an individual who is not the direct purchaser." *Centi*, 413 F. Supp. 3d at 176. This includes the buyer's employees. *Id.*; *see also Benjamin v. Fosdick Mach. Tool Co.*, No. 11-CV-571, 2013 WL 3784139, at *2 (W.D.N.Y. July 18, 2013).

It is undisputed that Carbon Products sold the subject Rotormill to Carbon Graphite, and not to Mr. Trask. Additionally, while Plaintiffs' counsel attempted at oral argument to distinguish this case on the basis that Mr. Trask was a manager and not merely a low-level employee, she also conceded that there was no case law supporting

---

apply for casual manufacturers as for casual sellers in any event, and the record before the Court is clear that Carbon Products modified the Rotormill for its own use and in an isolated fashion.

the proposition that a casual seller's duty to warn extended to a buyer's managers. The Court does not find that Mr. Trask's status as a manager-level employee of Carbon Graphite warrants application of a different rule of law. Accordingly, Carbon Products owed no duty to Mr. Trask and the negligence claim against it must fail.

Further, even assuming that Carbon Products owed a duty to Mr. Trask to warn of known, non-obvious defects, Plaintiffs' argument that "Carbon Products was in a position to warn IPEC that the maximum safe rotor speed was unknown, yet failed to do so" (Dkt. 78-4 at 4) is wholly without merit. Plaintiffs have not even attempted to explain how Carbon Products' alleged failure to advise IPEC (the original manufacturer of the subject Rotormill) that the maximum safe speed was unknown would somehow render it liable to Plaintiffs. Plaintiffs have also not explained how the alleged fact that the maximum safe speed of the subject Rotormill was unknown was not obvious or readily discernible. Plaintiffs say that Carbon Products should have "warn[ed] [Carbon Graphite] about the lack of warnings or information from IPEC about safe rotor speed" (*id*.), but the lack of such information would have been both obvious and readily discernible, inasmuch as it was not included in the subject Rotormill's manual and there were no warnings on the subject Rotormill itself.

IPEC argues that Carbon Products must be liable in negligence to the same degree as IPEC, because "[t]o the extent that this Court finds that IPEC should have known that the machine could, in the future, be operated past the max safe speed of the rotor and blades thereof, then [Carbon Products] likewise should have known and had an obligation to warn [Carbon Graphite/Mr. Trask]." (Dkt. 76-1 at 20-21). However, the New York

Court of Appeals made clear in *Sukljian* that "a determination of negligence . . . must begin with consideration of the duty owed, which is a matter of policy, rather than with the issue of foreseeability[.]"  69 N.Y.2d at 97.  In other words, even if the danger was equally foreseeable to IPEC and Carbon Products, that is not determinative—what matters is the scope of the duty each owed to Mr. Trask, which is different with respect to a manufacturer and a casual seller.

For all these reasons, the Court grants summary judgment to Carbon Products as to Plaintiffs' negligence claim.

## C.    Breach of Warranty

Plaintiffs again concede that their breach of warranty claims are time-barred. (Dkt. 78 at ¶ 1).  Accordingly, the Court grants summary judgment to Carbon Products as to these claims.

## D.    Loss of Consortium

"A claim for loss of consortium or services is a derivative action, and in the common law of New York, does not exist independent of the injured spouse's right to maintain an action for injuries sustained."  *Bertini v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 246, 260 (E.D.N.Y. 2014) (quotation omitted).  Because Mr. Trask cannot succeed on his substantive claims against Carbon Products, Mrs. Trask's loss of consortium claim necessarily fails.

## E.    Cross-Claim by IPEC

IPEC has asserted a cross-claim against Carbon Products for contribution and/or indemnification.  Under New York law, "two or more persons who are subject to liability

for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought." N.Y. C.P.L.R. 1401. "[T]he critical requirement for a contribution claim under New York law is that the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought." *Perkins Eastman Architects, P.C. v. Thor Engineers, P.A.*, 769 F. Supp. 2d 322, 327 (S.D.N.Y. 2011) (citation omitted). "A tortfeasor's liability for contribution may flow from either of two sources: breach of a duty to the plaintiff [the injured party] or to the party seeking contribution." *Westport Marina, Inc. v. Boulay*, 783 F. Supp. 2d 344, 357 (E.D.N.Y. 2010) (citation omitted and alteration in original).

Carbon Products has established that it did not breach a duty to Plaintiffs, for the reasons set forth above. In addition, IPEC conceded at oral argument that Carbon Products did not owe it a duty separate and apart from any duty to Plaintiffs. IPEC thus cannot succeed on a contribution claim against Carbon Products.

As to IPEC's claim for indemnification, "[u]nder New York law, common-law (or implied) indemnity 'is a restitution concept which results in a shifting of the loss because to fail to do so would result in the unjust enrichment of one party at the expense of the other.'" *Amguard Ins. Co. v. Getty Realty Corp.*, 147 F. Supp. 3d 212, 220 (S.D.N.Y. 2015) (quotation omitted). "[A] cause of action for common-law indemnification can be sustained only if: (1) the party seeking indemnity and the party from whom indemnity is sought have breached a duty to a third person, and (2) some duty to indemnify exists

between them." *Highland Holdings & Zito I, L.P. v. Century/ML Cable Venture*, No. 06 Civ. 181 (GBD), 2007 WL 2405689, at *4 (S.D.N.Y. Aug. 24, 2007), *aff'd sub nom. In re Century/ML Cable Venture*, 311 F. App'x 455 (2d Cir. 2009). Again, Carbon Products has established that it did not breach a duty to Plaintiffs, and so IPEC cannot succeed on its indemnification claim. Carbon Products is entitled to summary judgment on IPEC's cross-claim against it.

## CONCLUSION

For the foregoing reasons, Carbon Graphite's motion for summary judgment (Dkt. 67) is granted, Carbon Products' motion for summary judgment (Dkt. 71) is granted, and IPEC's motion for summary judgment (Dkt. 74) is granted in part and denied in part. The only remaining claims are Plaintiffs' strict products liability and negligence causes of action against IPEC based upon a failure to warn and the associated loss of consortium claim asserted based upon those theories of liability. The Clerk of Court is directed to terminate Carbon Graphite and Carbon Products as parties to this action.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      June 21, 2023
            Rochester, New York